**UNITED STATES FIDELITY & GUARANTY COMPANY, and American Bankers Insurance Company, Plaintiffs,**

v.

**Joseph L. HOUSKA and Judy C. Houska, Defendants,**

and

**Cenit Bank, F.S.B., Intervenor–Defendant,**

and

**Jack D. Maness, Trustee for the Bankruptcy Estate of Joseph L. Houska and Judy C. Houska, Intervenor–Defendant.**

Civ.A. No. 2:94cv312.

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 4, 1995.

---

496

William Charles Waddell, III, Waddell & Barnes, Newport News, VA, for U.S. Fidelity & Guar. Ins. Co.

Allen Williamson Beasley, Breeden, MacMillan & Green, Norfolk, VA, Thomas Jeffrey Salb, Michael Trevor Zugelder, Breeden, MacMillan & Green, Norfolk, VA, Clayton H. Farnham, Dennis Hall, Phillip Comer Griffeth, Atlanta, GA, for American Bankers Ins. Co. of Florida.

Harold Barnes, Barnes & Associates, Suffolk, VA, for Joseph L. Houska and Judy C. Houska.

Robert Vincent Roussos, Roussos and Langhorne, P.L.C., Norfolk, VA, for Jack D. Maness.

David Scott Seery, Patrick Louis Hayden, Thomas Edward Cabaniss, McGuire, Woods, Battle & Boothe, Norfolk, VA, for Cenit Bank, F.S.B.

Jon David Becker, Jon D. Becker & Associates, Virginia Beach, VA, for Gary Madsen.

Stephen Wainger, Albert Harrison Poole, Huff, Poole & Mahoney, Virginia Beach, VA, for Goodman–Gable–Gould Co. and Karl L. Denison.

Carrollyn C. Cox, Edward Leslie Cox, Cox and Cox, Virginia Beach, VA, William F. Merlin, Jr., Tampa, FL, for William F. Merlin, William F. Merlin, Jr., P.C., Carrollyn C. Cox and E. Leslie Cox, Cox and Cox, Attys. at Law.

## OPINION AND ORDER

DOUMAR, District Judge.

The underlying action involved in this case is a declaratory judgment action brought by USF & G Insurance Co. and American Bankers Insurance Co. to declare two policies of insurance void because defendants (Joseph and Judy Houska) allegedly made material misrepresentations and intentionally set, or caused to have set, the fire causing the loss. The insurance covered losses to the personalty and buildings located at 1333 Mockingbird Place, Virginia Beach, Virginia, which was property titled in the names of Joseph and Judy Houska. The Houskas have made claim against the insurers in the amounts of $1,243,096.01 for the dwelling and $647,350.05 for the personalty, and the defendants allege breach of contract to pay for the losses. Jurisdiction is based on diversity of citizenship.

### I. Factual and Procedural Background

This case presents a relatively novel and complex interrelationship between bankruptcy, insurance, and procedural law, particularly considering the unusual facts presented. Accordingly, the court must spend some time detailing the relevant factual background, which for purposes of this motion is largely undisputed. There are two different policies of insurance allegedly insuring the same property involved in this case, issued at different times, at the request of different persons with entirely different intentions. These policies named the Houskas as insured and contained a mortgagee loss payable clause naming the Household Mortgage Corporation ("Household"), the holder of the first deed of trust on the property.

The defendant Houskas filed a Chapter 11 bankruptcy petition on August 27, 1991. Houskas were debtors-in-possession. At this point, all of the Houskas' preexisting interest in property became property of the estate. 11 U.S.C. § 541(a). In the first instance, even property later exempted from the estate is property of the estate. The Houskas filed Schedules listing exemptions on October 17, 1991. The schedules listed almost all of the Houska's personal property that was later allegedly destroyed in the fire. No objections to these exemptions were ever filed. On October 25, 1991, a § 341 creditors' meeting was held, continuing one that had begun on September 16, 1991. At that meeting, Mr. Houska confirmed that all of the real property was insured and Mr. Houska's attorney provided the certificates of insurance to the U.S. Trustee. The homeowners insurance at that time was pursuant to a policy issued by the Home Insurance Company, which policy was for the period from June 19, 1991 until June 19, 1992. The Home policy was automatically reissued sometime prior to June 1992 for the time period between June 19, 1992 and June 19, 1993, but it was cancelled prior to the date of inception. Dates, timing, and intent become significant factors in this case.

On April 30, 1992, the bankruptcy court, on the debtor's motion, converted the case to Chapter 7. On May 20, 1992, Jack D. Maness was appointed the trustee of the estate. Mr. Maness never lodged any objections to the above-described exemptions for personalty that had been claimed by the Houskas.

Prior to June 19, 1992, the Houskas cancelled the Home policy referenced above and switched their homeowners coverage to an identical USF & G policy effective June 19, 1992 to June 19, 1993. The Houskas made this change to their insurance coverage because Home had declined to continue their auto coverage and the Houskas, in conjunction with their insurance agent Scot Creech, desired to maintain a "package deal" on homeowners and auto policies. The Houskas had suffered losses on their auto policy with Home and Home had declined to renew the auto coverage. Thereupon, the Houskas' insurance agency, headed by Scot Creech, the same agency which obtained the Home policy, sought to find an insurer willing to cover both home and auto for a premium discount. The agency on June 5, 1992 replaced the Home homeowners policy, which by then had automatically renewed for the June 19, 1992 to June 19, 1993 period, with a policy from USF & G which provided the exact same degree of coverage, effective dates, and terms (other than the fact that USF & G's auto and home coverage together provided a premium discount). USF & G was willing to

maintain an auto policy on the Houska's vehicles while Home was not because their daughter, who had been involved in some of the accidents, was no longer a resident of the household. Although it is undisputed that the trustee did not play any direct role in acquiring the USF & G homeowners policy, it is not clear from the record whether the debtor used exempted or postpetition earnings to acquire the policy. On June 22, 1992, a new § 341 meeting was held pursuant to the now Chapter 7 case at which the trustee Mr. Maness presided but no new mention was made of insurance. As noted, however, the insurance certificates representing the Home policy had been previously tendered to the U.S. Trustee pursuant to the Chapter 11 proceeding. At the June 22, 1992 § 341 meeting, insurance was not discussed in any way and nothing related to the USF & G replacement policy was tendered by the debtors or requested by the trustee, even though the certified Home policy had expired and was not effectively renewed.

On August 7, 1992, defendants' residence and its contents at Mockingbird Lane were destroyed by fire. The fire was determined by the local fire authorities to have been intentionally set, but to date no arson charges have been brought. Household is the holder of the first deed of trust on the property and was named as a loss payee under both insurance policies. The issuer of the second insurance policy involved in this case, American Bankers Insurance Company, had a contractual relationship with Household in which if either party determined there was no insurance on a property in which Household was the mortgagee, a policy of insurance would be "force placed" by American Bankers. At an unknown time, Household, believing there was no insurance on the property, told American Bankers to write a policy. At a later unknown time, Household informed American Bankers that no policy was needed. Nevertheless, sometime between March 11, 1993 and March 17,

1993, well after the insured property itself lay in ashes, American Bankers issued a policy which named the Houskas as insured and Household as loss payee and retroactively covered the period of time which included the fire loss. Neither the Houskas nor the trustee had anything to do with the acquisition of this policy, nor were any estate funds used to acquire this policy. It is the court's view, as explained below, that this placement of the American Bankers policy is materially different than the manner by which the Houskas caused the USF & G policy to replace the Home policy relied on to exist by the general creditors and the trustee. Neither the substituted USF & G policy nor the American Bankers policy, both of which were entered into after the filing of the Chapter 11 bankruptcy petition and the conversion to Chapter 7, names the trustee as an insured.

After the fire, the Houskas made claim against both insurance policies by various sworn statements in proof of loss, the last being in the amount of $1,243,096.01 for the dwelling and $647,350.05 for personal property.[1] The trustee never filed any claim against either company under the policies themselves. At present, the Houskas seek only payment for the personalty, having abandoned any claim to payment for damage to the real property. The trustee, conversely, now in this suit seeks payment only for damage to the real property, having failed to object to the exemption from the estate by the Houskas of their personalty. Plaintiff insurers have paid Household, the senior mortgage holder and named mortgagee in the policies, $679,316.75, receiving in return an assignment of the mortgage. Plaintiffs have refused to pay any other claim associated with the loss, contending that their investigation reveals that the Houskas intentionally set the fire and falsely represented, under oath, the amount of the loss. Plaintiff insurers filed the complaint for declaratory judgment on March 22, 1994, naming the Houskas as defendants, and asking to be relieved

---

1. In their bankruptcy petition, the Houskas had valued their household goods and furnishings at a total of $9,440, their wearing apparel at $1,000, furs at $750, Mrs. Houska's jewelry at $2,000, and claimed the same items at exempt. The Houskas have been indicted for bankruptcy fraud in connection with the valuation of their personalty in their bankruptcy schedules. This development does not affect this opinion insofar as these cross-motions for summary judgment were filed by the plaintiff insurers and the trustee in bankruptcy.

of any liability under the policies. As a result, myriad questions have arisen and this opinion addresses most of those raised by the various pleadings and hearings to date.

The insurance policies at issue each have an identical clause which mandates that actions be brought on the policies within a two year time period from the date of loss. The provision is substantially the same as that mandated by Va.Code Ann. § 38.2–2105. A letter written by trustee Maness to USF & G on March 23, 1993, a year before the insurers filed the instant declaratory judgment action and well within the two year statutory and contractual suit limitation period, indicates that the trustee had been "advised [that the Houskas claim] would probably be rejected by USF & G" and that the trustee had been sent a blank claim form. (Letter from trustee to R. Lisor of USF & G, Ex. A to submission to court by trustee filed April 28, 1995). On July 28, 1993, the trustee was sent a copy of the USF & G policy at issue. A letter from trustee Maness to an attorney representing USF & G in this litigation dated June 21, 1994, which date was over six weeks before the two year suit limitation period would expire, references the trustee's knowledge of the litigation against the Houskas by both USF & G and American Bankers concerning the loss. Yet it is undisputed that the trustee never, within the two year suit limitation period, 1) made a claim against the policies, 2) filed suit against the insurers, or 3) moved to intervene in any capacity in this existing suit.

On August 5, 1994, on the other hand, just before the two-year limitation period expired, Cenit Bank, F.S.B., motioned to intervene as of right as a defendant pursuant to Fed. R.Civ.P. 24(a)(2), or, alternatively, permissively pursuant to Fed.R.Civ.P. 24(b). Cenit holds two exchange notes dated December 1, 1991 and made by Joseph Houska and others, representing a total indebtedness of over $4,800,000. The notes are secured to the extent of $200,000, plus interest and attorney's fees, by the lien of a second deed of trust dated June 14, 1990 on the subject property.[2] They are also allegedly secured to the extent of $200,000, plus interest and attorney's fees, by a perfected security interest alleged to exist in all furniture, fixtures, and personal property owned by the defendants and located in or affixed to the realty. Plaintiff insurers agree that Cenit has an equitable lien on any insurance proceeds due the Houskas, by virtue of Cenit's contractual agreement with the Houskas. The court permitted Cenit to intervene permissively on September 21, 1994. Under the U.C.C., Va. Code Ann. § 8.9–306(1), Cenit's contractual security interest extends to insurance proceeds that are payable based on loss or damage to the collateral. This intervention is through the counterclaim of the Houskas. To the extent this claim of Cenit might be sustained, it will pass through the Houskas to the estate and thence to Cenit.

As noted, the trustee, although aware of the loss and the existence of insurance coverage, never filed suit or made a claim against the insurers. Moreover, the trustee did not on its own motion *ever* make an effort to intervene in this suit prior to the prompting of the court. The trustee did not intervene or desire to make a claim, apparently leaving it to the Houskas in their own right to proceed on behalf of the estate. The court strongly suggested that the trustee intervene in this case on December 29, 1994. By that time, the two year time period had elapsed. The court prompted the trustee's participation, over the objection of the insurers, because the original attorneys for the Houskas sought leave to withdraw and it appeared the Houskas would proceed *pro se*. Moreover, following the objection of the insurers, the trustee argued in support of his intervention that he would merely be standing in the shoes of the Houskas. Under the circumstances, the court felt that any interest of the creditors (as represented by the trustee) which was derived through the Houskas' counterclaims might not be adequately represented by the Houskas proceeding *pro se*. When the intervention was opposed by the insurers, the trustee argued in support of intervention that he stood in the shoes of the Houskas. On January 27, 1995, the court

---

2. This deed of trust (mortgage) is secondary to the deed of trust to Household Mortgage, but Cenit was not insured nor listed on any insurance policy.

issued an order permitting the trustee to intervene in this action. After the intervention, the trustee then claimed in his motion for summary judgment that his rights exceeded those of the Houskas. On March 14, 1995, the Houskas obtained an attorney.

These cross-motions for summary judgment primarily raise the issues of (1) whether the trustee has any interest in the postpetition insurance contracts; (2) whether the trustee has rights under the policies superior to the Houskas under the reasoning of the court in *In re J.T.R. Corp.*, 958 F.2d 602 (4th Cir.1992) (*per curiam*), given the factual and procedural posture of this case and the circumstances of the trustee's intervention; and (3) whether the contractual two-year suit limitation period contained in the insurance policies serves to cut off any claim of the trustee. Although Cenit has joined the trustee's motions and filed supporting briefs, the Houska debtors are not involved in these cross-motions for summary judgment.

## II. *Summary Judgment Standard*

To sustain a motion for summary judgment, the Court must find that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

The party seeking summary judgment is initially responsible for identifying the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When this burden is met, the nonmoving party must show, through affidavits or other proof, that a genuine issue of material fact does exist. *Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). "The mere existence of a scintilla of evidence" will not support this finding. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

Summary judgment must be entered against a non-moving party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a

situation, there can be 'no genuine issue as to any material fact....' " *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. In deciding the motion, the Court must view all inferences drawn from the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In this case, the relevant facts are essentially undisputed.

## III. *Threshold Legal Issue—Trustee's Interest in Policies*

A threshold legal issue presented by this case is whether the trustee in bankruptcy has any interest at all, whether derivative of the debtor or otherwise, in the proceeds from an insurance contract, not naming the trustee as insured and entered into postpetition, which contract appears to insure property that is property of the estate but also insuring the debtor's separable exempt property interests. The insurers argue that the trustee cannot have any interest in these insurance contracts because they were entered into postpetition.

■ The court is of the opinion that the trustee can rightly assert an interest in the USF & G insurance contract, because it stands in the place of and represents the same prepetition insurance coverage, known to the debtor and the trustee, that was to have been provided by the Home policy renewal. The American Bankers policy was entered into for a completely different reason following the loss itself and can in no way be said to have been entered into for the benefit of the debtors' estate.

■ "The commencement of a case [under the Bankruptcy Code] creates an estate ... comprised of ... all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). In addition to the fact that the determination of estate property is made "as of the commencement of the case," it is important to note that it is *not* the debtor's property itself which becomes property of estate but rather the debtor's interest in such property. Section 541(a)(6) of the

Bankruptcy Code further defines property of the estate to include potentially postpetition:

> (6) Proceeds, property, offspring, rents, or profits of or from property of the estate . . .

Section 541(a)(7) pulls in after-acquired property if it is acquired by the estate:

> (7) Any interest in property that the estate acquires after the commencement of the case.

In this case there is no contention that the American Bankers policy was acquired by the estate or anyone, such as Mr. Houska, who could be said to be at least in part acting for the benefit of the estate.

■ Although federal bankruptcy law delineates what types of interests in property become property of the estate under § 541, the court must normally look to state law attributes of property to determine whether these property interests exist in a given case:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests in both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a "windfall merely by reason of bankruptcy."

*Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) (question of whether a security interest in property extends to rents and profits derived from the property must be resolved by reference to state law, not some federal rule of equity) (*quoting Lewis v. Manufacturer's Nat'l. Bank,* 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323 (1961)).

■ Under Virginia law, payments pursuant to a contract of insurance protecting against damage to property are *not* considered to be proceeds derived from the property itself (except in the case of a secured creditor under the Uniform Commercial Code who has a interest in the property as collateral—i.e., Cenit Bank, in this case). In *Thompson v. Gearheart*, 137 Va. 427, 119

S.E. 67 (1923), the Supreme Court of Virginia held that insurance proceeds were not payable to remaindermen not named in the contract of insurance despite their acknowledged ownership interest in the related underlying property:

> The life tenant was under no obligation to insure the property for the benefit of the remaindermen. Each of them had an insurable interest in the property, but a policy in the name of one could not cover the interest of the other.

*Id.,* 119 S.E. at 68. The court there further quoted a case from New Jersey to the effect that the *insurance proceeds do "not stand in the place of the property." Id.* (emphasis supplied). More recently, the Virginia Supreme Court expressly reaffirmed the holding of *Thompson.* In *Lynch v. Johnson,* 196 Va. 516, 84 S.E.2d 419, 423 (1954), the court quoted *Thompson* to the effect that "*the amount paid by the company is in no proper or just sense the proceeds of the property.*" (Emphasis supplied).

This distinction would not matter if the proceeds at issue in this case were payable from the Home insurance policy in existence at the time the Houskas filed for bankruptcy and later when the case was converted to Chapter 7 and the trustee named. At the time the Houskas filed their petition for bankruptcy, it is not disputed that the estate created included *both* the debtors' interest in the real property at issue and the debtors' interest in the prepetition Home insurance policy which covered that property. Thus, it is clear that the trustee would have had a property interest in any proceeds payable under the subsequently cancelled Home insurance policy because by operation of law the estate acquired the debtors' interest in the underlying *prepetition* insurance contract itself upon the filing of the bankruptcy petition.

However, the trustee does not acquire a property interest in the proceeds payable from the *postpetition* USF & G or American Bankers insurance policies under Virginia law merely because the trustee may have had a property interest in the real property insured. After all, the Houskas had separable

insurable interests at that time and they were postpetition Chapter 7 debtors.

■ The Virginia Supreme Court in *Lynch,* however, recognizes a limited caveat to the general rule that insurance proceeds are contractual in nature and personal to the named insured and not in any sense proceeds arising from the covered property itself. Where the intent of the parties is to insure the property for a third party's benefit, the third party has an interest in the proceeds. *Lynch,* 84 S.E.2d at 423. The *Lynch* court stated the general rule but then went on to delineate the exception:

> On the other hand, if any person own an insurable interest in property which is insured for his benefit under any agreement or obligation by some other person, then such owner has an enforceable claim against the proceeds of that insurance. When the persons for whose benefit insurance is secured are not named, or are imperfectly or improperly named in the policy, the identity of such persons may be shown by extrinsic evidence.

*Id.* In this case, the practical realities of the bankruptcy process militate in favor of viewing the USF & G policy as being obtained by the debtor to replace the Home insurance policy, which the debtor, the creditors, and this court assumes the trustee knew was in place, with the intent to protect the interests of the estate or at least an awareness that such was important. There would be great disruption in the administration of bankruptcy estates if the trustee must constantly monitor and attempt to ascertain if the debtor has routinely replaced the existing prepetition policy, which the trustee clearly has an interest in, with a new policy that otherwise the trustee may have no interest in under state law. In this case the undisputed facts show that the USF & G policy was entered into by the debtor to replace the prepetition Home policy, without the apparent knowledge of the trustee, because the debtor's auto insurance with Home was being cancelled. At the time the debtor knew that the trustee and creditors believed that at the previous Chapter 11 § 341 meeting it was confirmed that the property at issue was insured for the estate's benefit by the Home insurance com-

pany. The substituted USF & G homeowners policy had identical coverage to that which had already been renewed by Home. It was obtained by the same agent for the policy term period and for the same purposes as the Home policy, which ostensibly was actually renewed on June 19, 1992. The Home policy was cancelled by the debtor and his agent prior to the renewal's inception date and the USF & G policy was issued in lieu thereof, replacing the Home policy. In all practical senses the USF & G policy stood in place of the preexisting and prepetition Home policy, the automatic renewal of which the trustee was entitled to rely on.

Moreover, contrary to the spirit of *Butner supra,* if this court held otherwise, the insurance company or the debtor might thereby obtain a "windfall merely by reason of bankruptcy." This windfall would be squarely at the expense of the debtor's creditors in a case such as this. Thus, at least where the debtor switches insurance policies for a routine reason without the knowledge of the trustee, and this occurs postpetition but before the bankruptcy case is closed, the trustee holds that interest in the replacement policy which he had been led to believe existed prepetition in the prior policy. In this case, because the prepetition Home policy would have been renewed prior to the fire at the exact same amount of coverage for the dwelling as the USF & G policy, the trustee has an interest in the USF & G policy up to its policy limit, $662,000, for the dwelling. Because USF & G has already paid out $353,244.71 to the mortgagee Household it is potentially liable to the trustee in the amount of $308,755.29.

However, none of these reasons support a finding that the trustee has any interest in the proceeds from the American Bankers policy. The mortgagee, Household, caused this policy to be "force placed" by American Bankers postpetition in March 1993, for the sole purpose of protecting Household's return from its investment in the property. The real property at issue that was property of the estate lay in ashes at that time. The trustee is not a named insured under the American Bankers policy, nor was he or the creditors other than the mortgagee House-

hold even considered. There was no possible intent on the part of any party to the contract, pursuant to the exception in *Lynch*, *supra*, to benefit the bankrupts' estate. The actions of Household and American Bankers in retrospect were clearly mistaken, in the sense that Household was in fact actually protected at the time of the fire by the USF & G policy. In no manner, though, could the trustee or the creditors he represents have relied on these subsequent actions of Household and American Bankers or the existence of the policy. The trustee had no knowledge of such a policy and could not have expected Household and American Bankers to mistakenly "force place" coverage when coverage already existed. Thus, there is no reason in the case of the American Bankers policy not to invoke the general rule under Virginia law that the "proceeds" of said policy are *not* property that is proceeds of the insured property itself. The proceeds of the American Bankers policy at issue here are thus not property of the estate as proceeds of property of the estate under § 541(a)(6), but rather any such proceeds would derive from a postpetition contract of insurance not intended in any way to benefit the trustee or any of the debtors' creditors other than Household Mortgage. As such, because the policy itself was entered into postpetition without intent to benefit the estate for purposes of § 541(a)(6), and was not acquired by the estate for purposes of § 541(a)(7), the trustee has no interest in any proceeds from the American Bankers policy.

■ The trustee argues that this court should reject the application of Virginia law under § 541(a)(6) and urges the court to hold that "proceeds" from insurance contracts that are entered into postpetition, which insurance policies are thus not themselves property of the estate under § 541(a), become proceeds of the insured property itself (the debtor's interest in which here is property of the estate under § 541(a)). This view would make any payment for damage to the real property from the American Bankers insurance policy proceeds of the property

itself rather than the insurance contract, despite the fact that Virginia courts consistently hold that "the amount paid by the company is in no proper or just sense the proceeds of the property." The trustee argues that under the authority of cases such as *Bradt v. Woodlawn Auto Workers, F.C.U.*, 757 F.2d 512 (2d Cir.1985), postpetition proceeds of insurance policies insuring estate property are estate property under § 541(a)(6) without reference to state law. In *Bradt*, the Second Circuit held that proceeds of an insurance policy insuring an automobile that was property of the estate were "proceeds" of the automobile itself and thus estate property under § 541(a)(6). The court in *Bradt* noted that:

> "Proceeds" in this [§ 541(a)(6) ] context is far less limiting than it is as defined under the *Uniform Commercial Code*. Proceeds is "intended to be a broad term to encompass all proceeds of property of the estate. The conversion in form of property of the estate does not change its character as property of the estate" H.R.Rep. No. 595, 95th Cong., 1st Sess. 368 (1977).... Thus, the insurance payment for repairs to an automobile that is property of the estate unquestionably is also property of the estate.

*Bradt*, 757 F.2d at 515. This court is ultimately unpersuaded by the trustee's argument against reference to state law for three reasons.

First of all, neither in *Bradt* nor any other case cited by the trustee was there any contention that the insurance policies at issue were entered into postpetition, and thus the insurance policies at issue in those cases were almost certainly property of the estate as much as the insured property was. As previously commented upon generally, then, it does not change the outcome in a case like *Bradt* whether the court views the insurance proceeds as being derived from the underlying insurance policy or (perhaps as stated by the *Bradt* court in a shorthand manner) from the destroyed or damaged insured property.[3]

---

**3.** This point is perhaps best illustrated by the fact that many cases citing *Bradt* describe it as standing for the unremarkable proposition that the estate succeeds to the debtor's interest in (implic-

itly prepetition) insurance contracts rather than that *any* insurance payment for damage to estate property is estate property regardless of state law. Of course under the first unremarkable

In either case, the estate clearly has an interest in the insurance proceeds. At the time of the filing of the petition in the instant case, however, the insurance policies at issue herein could not have been considered part of the estate, because they were not yet in existence.[4] The precise issue this crucial factual difference raises in the instant case is that under Virginia law insurance payments are not considered proceeds derived from the insured property but rather proceeds derived solely from the insurance contract—and the trustee conceivably has an interest only in the USF & G insurance contract. This court must thus distinguish between the concepts of proceeds as derived from the insurance contract versus proceeds as derived from the damaged property. This type of distinction simply was not material to the court's decision in cases such as *Bradt*.

Moreover, in cases where courts and commentators have considered whether insurance contracts were entered into prepetition or postpetition, they have of course noted that such timing is consequential in the bankruptcy context. *See e.g., In re Natale,* 174 B.R. 362, 365 (Bankr.D.R.I.1994) ("Property of the estate includes any rights the debtor may have under a policy of insurance *which is in effect on the date of filing.*") (emphasis supplied) (citing *In re Dennison,* 84 B.R. 846 (Bankr.S.D.Fla.1988)); *In re Fox,* 80 B.R. 753, 755–56 (Bankr.W.D.Pa.1987) (proceeds from fire insurance policy were property of estate where debtor had insured interest *pri-*

*or* to filing petition; determinations under § 541(a) are to be made by reference to state law); Epstein, Nickles, & White, *Bankruptcy* § 2–8 (Hornbook ed. 1993) ("... D[ebtor] owns the Blackacre Bar and Grill at the time of her Chapter 11 filing. Postpetition, Blackacre Bar and Grill is destroyed in a fire, and D receives $100,000 pursuant to a fire insurance policy *that she obtained prepetition.* The $100,000 is property of the estate.") (emphasis supplied); *cf. In re CS Assocs.,* 161 B.R. 144, 146–48 (Bankr.E.D.Pa.1993) (in federal tax lien case, because Pennsylvania (like Virginia) considers insurance payments to be proceeds of the insurance contract and not the damaged property, IRS tax lien did not attach to proceeds from postpetition insurance policy even though it attached to the prepetition property destroyed; "in bankruptcy, the time that an interest matures may have great significance").

This court's second reason for construing the term "proceeds" of estate property under § 541(a)(6) by reference to state law, although not dispositive, is that the Fourth Circuit has construed the identical term "proceeds" of estate property under closely-related § 552(b) of the Bankruptcy Code[5] by reference to state law. The Fourth Circuit reached this result despite the applicability to § 552(b) of almost identical remarks in the legislative history as are applicable under § 541 and set out above by the court in *Bradt*. Section 552(b) of the Code is con-

---

view, the estate has an interest in any derivative proceeds from the prepetition insurance policies, a point this court is in full agreement with. *See e.g., Plaza at Latham Assocs. v. Citicorp North America, Inc.,* 150 B.R. 507, 513 (N.D.N.Y.1993) (stating that the "Second Circuit has consistently characterized a debtor's rights *under its insurance policy* as property of the debtor's estate under s 541(a) of the Bankruptcy Code" and citing *Bradt* for such a holding in regards to "motor vehicle insurance") (emphasis supplied); *In re Pied Piper Casuals, Inc.,* 50 B.R. 549, 550–51 (Bankr.S.D.N.Y.1985) (citing *Bradt* to effect that derivative proceeds of insurance policies in which estate owns an interest are property of the estate) (*rev'd on other grounds,* 65 B.R. 780 (S.D.N.Y.1986); *In re Woods,* 97 B.R. 850, 851 (Bankr., W.D.Va.1989) (same). In the instant case, of course, the estate does *not* obtain an interest in the insurance policies by virtue of their existence at the time of filing the petition because these are postpetition insurance policies.

4. An estate in bankruptcy generally consists of the legal and equitable interests that the debtor has "as of the commencement of the case." 11 U.S.C. § 541(a)(1). Although this definition is broad and includes contingent interests, it is limited to such interests that are in existence at the outset of the bankruptcy case.

As explained *supra,* the USF & G policy was intended by the debtor to replace the existing Home policy which the debtor knew the estate had an interest in. As such, the estate was an intended beneficiary under the exception in the *Lynch* case.

5. The phrase "proceeds, products, offspring, rents, or profits" of estate property appears in both § 541(a)(6) and § 552(b) of the Bankruptcy Code.

cerned with the postpetition effects of pre-petition security interests. In *In re Bumper Sales, Inc.*, 907 F.2d 1430 (4th Cir.1990), the Fourth Circuit held that because § 552(b) expressly refers to "applicable nonbankrupt-cy law," and because "judicial creation of a definition for 'proceeds,' broader post-peti-tion than pre-petition, would produce arbi-trary and potentially inequitable results," state law determines whether postpetition inventory and receivables are "proceeds" un-der § 552(b). *Bumper Sales*, 907 F.2d at 1437. In so doing, the court rejected the argument that legislative history compelled a more expansive federalized view of "pro-ceeds":

> The other interpretation relies primarily on the legislative history stating that "[t]he term 'proceeds' is not limited to the techni-cal definition of that term in the UCC, but covers any property into which property subject to the security interest is convert-ed." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 377 (1977).... This view encour-ages a broader coverage of proceeds than in the UCC.... However, we believe that Section 552(b)'s express reference to "non-bankruptcy law" should take priority over a vague and isolated piece of legislative history. *We also note that the judicial creation of a definition for 'proceeds,' broader post-petition than pre-petition, would produce arbitrary and potentially inequitable results.* As a result, we hold that the UCC's definition and treatment of proceeds applies to Section 552 of the Bankruptcy Code.

*Id.* (emphasis supplied). Although in § 541(a) there is no express reference to "applicable nonbankruptcy law," the Fourth Circuit's more general reasoning concerning like treatment of "proceeds" in bankruptcy and nonbankruptcy contexts is fully applica-ble to § 541 and consonant with *Butner*. Moreover, there is some reason to discount statements in the legislative history of § 541 suggesting that federal law should generally be more expansive than state law in deter-mining what may become estate property in light of Congress' subsequent last-minute compromise permitting states to override federal exemptions:

> The statements in the House and Senate Reports about the all inclusive scope in-tended for § 541 were made at a time when the House version of the bankruptcy reform bill contained a system of federal exemptions that was available in bankrupt-cy regardless of state law. A system of federal exemptions that could not be stripped away by the states may have been viewed as fair compensation to debtors for the all inclusive nature of § 541. Once § 522 was recast on the eve of passage [to permit states to define exemptions accord-ing to state law] ... the trade-off between federal exemptions and a broad view of § 541 arguably should no longer govern.

Eisenberg, "Bankruptcy Law in Perspec-tive," 28 U.C.L.A.L.Rev. 953, 972 n. 60. (1981). While this court recognizes that some courts might construe differently under §§ 541 and 552 the phrase "proceeds, prod-uct, offspring, rents, or profits,"[6] in the ab-sence of controlling contrary authority and under the facts of this case this court will refer to state law in construing the phrase as did the Fourth Circuit in *Bumper Sales*.

The third reason this court will consider state law as to the question of whether a casualty insurance payment is a proceed of an insurance contract as opposed to a pro-ceed of the damaged property returns us to the fact that the United States Supreme Court in *Butner* compels this approach ab-sent a countervailing federal interest, and no such countervailing federal interest has been demonstrated in this case. It should be not-ed that although *Butner* was decided under the Bankruptcy Act of 1898, the principles stated therein remain valid under the Bank-ruptcy Code. *See Barnhill v. Johnson*, 503 U.S. 393, 397–98, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992) (in absence of controlling federal law, interests in property are crea-tures of state law); *In re Village Properties, Ltd.*, 723 F.2d 441, 444 (5th Cir.) (*Butner* emerged "unscathed by the new Bankruptcy Code"), *cert denied*, 466 U.S. 974, 104 S.Ct.

---

**6.** *See e.g., Financial Security Assurance, Inc. v. Tollman–Hundley Dalton, L.P.*, 165 B.R. 698, 703 (N.D.Ga.1994) (recognizing possibility of dispa-rate treatment of the same phrase between sec-tions of the Code but adopting *Bumper Sales* construction under § 552(b)).

2350, 80 L.Ed.2d 823 (1984). Perhaps in search of such a "countervailing interest," the trustee argued in oral argument that often a debtor will file a bankruptcy petition and then subsequently obtain a postpetition insurance policy covering estate property either in preparation for a § 341 meeting (upon advice of counsel for example) or as a result of such meeting when it is shown that no insurance is in place.[7] The trustee argues that this court's holding would make such postpetition coverage not inure to the benefit of the estate should a loss occur.

The court, to the contrary, sees such an insurance policy as being clearly intended to benefit the estate and so the estate would be a beneficiary under the *Lynch* caveat. As with the USF & G contract in this case, the court would hold that any postpetition insurance policy intended to protect the estate inures to the benefit of the estate under Virginia law. Moreover, the court is aware of nothing which prevents the trustee himself from obtaining any necessary insurance coverage on estate property or at least ensuring that the estate is protected as a loss payee. This court's holding merely reinforces the valuable principle of bankruptcy that the trustee has at least a minimal duty to protect the assets of the estate. The only interest that is really implicated by the trustee's argument is the interest that a trustee may have in neglecting totally to inquire about or ensure insurance coverage, an "interest" that surely should not be encouraged by this court,[8] and then benefiting from a postpetition insurance policy not contracted for with any intent to protect the estate and of which the trustee was not even aware. This court simply does not view such an "interest" as substantial.

In sum, this court does not hold in the abstract that all conceivable questions regarding property interests arising under § 541 must be resolved by reference to state law. In this case, however, no reason has been demonstrated why this court should view a contingent casualty insurance pay-

ment from American Bankers as proceeds of the property damaged or destroyed, in contravention of long-established Virginia law to the contrary, because of the happenstance of bankruptcy in this case. This is particularly true where that policy 1) was entered into postpetition and post-casualty; 2) was not obtained with the knowledge of or for the benefit of the estate; 3) neither the estate nor the debtor had a role in obtaining the policy; 4) the trustee is not named in the policy; and 5) the policy was not obtained with estate funds. This court's ruling on this issue has the effect of returning the parties involved in the instant cross-motions to the exact position they held at the time of the filing of the bankruptcy petition with the sole exception being that the USF & G policy stands in place of the identical Home policy which it replaced.

### IV. The Extent of the Trustee's Interest as Intervenor

■ The court has determined that it would be improperly prejudicial to the insurers in this case to allow the trustee to intervene after the suit limitation period has elapsed and assert rights greater than those that would be derivative of the Houska's rights, whether the intervention be considered as of right or permissive. In other words, under the circumstances of this case, the trustee is subject to the defenses of arson and fraud that may be raised by the insurers against the Houskas. This would be the only equitable result where the trustee declined to become involved and only became involved when this court itself strongly urged such involvement.

The trustee argues that despite his lack of diligence in pursuing any independent claim the Fourth Circuit's decision in *In re J.T.R. Corp.*, 958 F.2d 602 (4th Cir.1992) (*per curiam*) compels a different result. In *J.T.R.*, the Fourth Circuit held that a Chapter 11 trustee could collect upon a fire insurance policy without regard to the insurer's defense

7. This specific argument was not advanced in the trustee's memorandums.

8. The court notes that the trustee herein did not inquire at all regarding insurance at the Chapter

7 § 341 meeting, but the court is assuming that he was aware of the certificates of insurance representing the Home policy previously filed at the Chapter 11 § 341 meeting.

of arson as against the debtor where the arson occurs after the filing of the bankruptcy petition. *Id.* at 604–05. The court held that the time of the filing of the petition was generally determinative. If the debtor's arson occurred prior to the filing, the estate acquired no greater rights than the debtor and was subject to defenses good against the debtor. *Id.* at 604. If the arson occurs after the petition is filed, the trustee is not so barred. *Id.* at 605. Because the arson in the instant case occurred after the filing of the petition, the trustee argues that he is entitled to summary judgment on his belated claim.

Besides sidestepping the thorny problem discussed in the preceding section regarding how at the determinative point of the petition filing the trustee acquires *any* right under insurance polices which do not yet then exist, the trustee's argument ignores the factual circumstances and the timeliness of his involvement in this case. Had the trustee made a claim or become a party in this action before his right to file an independent action had expired, the court would have applied *J.T.R.* to grant summary judgment in favor of the trustee as against the USF & G policy, for the reasons discussed in the preceding section. In *J.T.R.*, in an apparently timely manner, the "trustee sought to recover" and "filed suit" against the insurer in bankruptcy court. *Id.* at 603. In this case, on the other hand, with timely knowledge of the coverage dispute and in a bankruptcy filing involving some of the most expensive residential real property in Virginia Beach, the trustee elected to allow the Houskas to counterclaim against the insurers and finance the recovery of insurance proceeds, which effort was clearly subject to the defense that the Houskas committed arson and misrepresented their losses. The trustee only became involved in the matter, over the objection of the insurers and after the two-year suit limitation period, at the explicit behest of the court when the Houskas' counsel withdrew. Under these circumstances, it would be an abuse of the rules permitting intervention and grossly prejudicial to the original plaintiffs to allow the trustee to introduce what in effect is a completely new cause of action unrelated to the original claims and counterclaims.

The Fourth Circuit has clearly stated that "[e]ven intervention as of right may properly be made conditional by the exigencies of a particular case" and that "[g]enerally speaking, an intervenor is held to take the case as he finds it." *Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n.,* 646 F.2d 117, 122 (4th Cir.1981). The Supreme Court has stated that even stringent conditions placed upon a permissive intervenor should not be treated as a complete denial of a party's right to participate in a case. *See Stringfellow v. Concerned Neighbors in Action,* 480 U.S. 370, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987).

Fed.R.Civ.P. 24(a)(2) permits intervention as of right when:

> the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

The Fourth Circuit has interpreted the rule to permit intervention as of right when the applicant can show three things: (1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; (3) that the applicant's interest is not adequately represented by existing parties to the litigation. *Virginia v. Westinghouse Elec. Corp.,* 542 F.2d 214, 216 (4th Cir.1976); *see also Teague v. Bakker,* 931 F.2d 259, 260–61 (4th Cir. 1991).

The relevant portion of Fed.R.Civ.P. 24(b) permits permissive intervention at the discretion of the court:

> Upon timely application anyone may be permitted to intervene in an action ... when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

In *Ionian Shipping Co. v. British Law Ins. Co.*, 426 F.2d 186 (2d Cir.1970) the Second Circuit confronted a case factually similar to the present case but, crucially, chronologically different. The mortgagee of a ship in *Ionian* sought intervention as of right between the insurer and shipowner in an action following a loss. As does the trustee in this case, the mortgagee claimed that it was not subject to the defense raised by the insurance company that the insured had intentionally caused the loss. "The nub of [the mortgagee's] claim for intervention is that is has, or may have, interests superior to those of Ionian...." *Ionian*, 426 F.2d at 189. Assuming that it was true that the mortgagee had superior interests than the shipowner, the court held that the mortgagee could not intervene as of right for the reason that its interest would not be impaired because it would not be bound by the result in a suit between the original parties raising the defense of intentional causation of the loss. *Id.* at 190. The key point was that if the mortgagee truly had an independent and superior claim, it could protect itself in an independent suit, and had no right to intervene as of right. The court noted that if it was assumed that the mortgagee's rights were no greater than the shipowner's, the shipowner in that case could fully represent those rights. The court suggested that the mortgagee move to intervene permissively because such action was still apparently timely and also noted that intervention could be made subject to any necessary conditions. *Id.* at 191–92.

In the case at bar, by the time the court suggested on December 29, 1994 that the trustee should intervene to protect what all parties and the court assumed to be rights derivative of the Houskas, *the trustee could not have brought an independent action asserting superior rights than those possessed by the Houskas because of the two-year suit limitation period contained in the insurance contracts,* particularly where no claim was ever filed by the trustee. *See* the following section, *infra.* The purpose for the court's suggestion that the trustee intervene was because any rights through the Houskas that the trustee had would not be adequately represented by the Houskas acting *pro se* in the wake of the court permitting the withdrawal of the Houskas' original trial counsel.

Because the trustee could not have instituted an independent action asserting its superior rights at the time the court suggested that the trustee intervene in this case, this case is analogous to that facing the court in *National Org. for Women, Inc. v. Minnesota Mining & Manufacturing Co.*, 73 F.R.D. 467 (D.Minn.1977). In the *NOW* case, the EEOC had earlier been permitted to intervene in a case involving private plaintiffs alleging discrimination against the 3M company. The 3M company moved to have the EEOC's participation limited to the scope of the complaint brought by the existing private plaintiffs. The court in *NOW* noted that the EEOC had not timely exercised its statutory rights to investigate and bring its own action. As such, "the EEOC failed to satisfy the statutory prerequisites for the maintenance of its own action," and the EEOC had therefore lost the power to bring an independent action raising issues beyond those raised by the existing parties. *Id.* at 471. The court was of the opinion that because of this failure on the part of the EEOC, "[t]he present case ... is not an appropriate one for allowing the EEOC to enlarge the scope of the action." *Id.* The court therefore held that the EEOC

> [W]ill be limited to intervening and assisting the private plaintiffs. The EEOC will not be permitted to use the mechanism of intervention to circumvent the statutory prerequisites to the EEOC's institution of its own action.

*Id.* The court in *NOW* further held that:

> When the court [earlier] permitted the EEOC to intervene, it remained empowered to exercise its discretion to limit the scope of that intervention. *Van Hoomissen v. Xerox Corp.*, 497 F.2d 180 (9th Cir.1974).

*Id.* at 471–72.

Like the EEOC in *NOW*, the trustee in this case failed utterly to timely protect independent rights against the insurance companies that it may have held under *J.T.R.* The court reemphasizes the fact that the trustee relied on the debtor alone to proceed in this case. The trustee chose not to file an action

within the two-year limitation period and never made a claim in his own right against the insurers on the policies themselves. Although timely apprised of the existence of the policies and the ongoing dispute over coverage, the trustee apparently never seriously investigated the possibility of its participation in litigation and did not even initiate in a practical sense its own involvement in this suit. For that reason, if anything this case is even a stronger one than *NOW* for limiting the scope of the intervention to the claims and defenses found in the original complaint and counterclaims between the parties. Here it is clear that the trustee only became involved in the suit at the behest of the court. The trustee was clearly prepared to sit out the litigation in the hopes its interests would be protected by counsel for the Houskas. The undisputed factual chronology and, importantly, the trustee's own submissions to the court belie this posture. For example, in opposing the insurer's assertion of the two-year suit limitation period, the trustee argued:

> In the case at bar, the Trustee is attempting to claim no more than that originally claimed by the debtors, and, in fact, could have waited until the end of the litigation and ordered a turnover of property from the debtors if the debtors had prevailed.... In the instant case, there is no prejudice to the insurers, no unexpected claim that is being brought, no undue surprise, no increased exposure.

(Trustee's Mem. in Opp. to Pl.Mo. for Summ.J. at 7).

In sum, by the time the court sought to have the trustee intervene, the trustee had clearly lost its ability to initiate an independent action against the insurers regardless of defenses against the Houskas. Thus for the court to permit the trustee to now assert a right superior to the rights of the debtors pursuant to the *J.T.R.* case would be to upend the original understanding of the court and the parties, including even the trustee, as to the reason for allowing the trustee to intervene. The trustee, who comes into this suit only at the urging of the court and after his ability to maintain a separate and independent action has expired, cannot have it both ways. If his claim is distinct and independent such that it is not subject to the defenses asserted against the Houskas, the trustee cannot use the mechanism of intervention to overcome his failure to comply with the contractual limitation period. *See NOW, supra.* If the court allowed the trustee to so utilize the mechanism of intervention, the trustee's own plea that his involvement presents no prejudice to the insurers and no increased exposure would be completely belied, and the court would violate Rule 24 because the unlimited intervention after the suit limitation period had passed would severely prejudice the insurers.

## V. The Two-Year Limitation Period

■ The insurers argue that summary judgment is proper against the trustee because he failed to bring suit or otherwise initiate action within the applicable contractual statute of limitations. The court's view of this issue is that it represents the converse of its ruling that the trustee's rights at the point the estate intervened must be derivative of the Houskas; because that is so, the trustee's involvement relates back to the counterclaim timely filed by the Houskas and the trustee may participate to assist in the recovery of proceeds from the USF & G policy that it otherwise could obtain in a turnover action subsequent to any such recovery by the Houskas.

■ Both insurance policies contain the following provision:

> 8. Suit Against Us. No action may be brought unless the policy of provisions have been complied with and the action is started within two years after the date of the loss.

In the court's opinion, this provision does not materially differ from the standard policy provision to the same effect found in Va.Code Ann. 38.2–2105:

> Suit. No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within two years next after inception of the loss.

This court has previously ruled that contractual suit limitation periods such as that at issue are valid provisions that apply to cut off a party's right to bring suit after their expiration. *See Koonan v. Blue Cross & Blue Shield,* 802 F.Supp. 1424 (E.D.Va.1992) (one-year contractual suit limitation period in health insurance policy is a valid and enforceable provision under Virginia law). The filing of a motion to intervene is generally regarded as the commencement of an action for purposes of whether an action is barred by a limitations period. *Braxton v. Virginia Folding Box Co.,* 72 F.R.D. 124, 127 (E.D.Va. 1976). The trustee attempts to avoid these rules by arguing that *Koonan* is distinguishable because it did not involve bankruptcy. The court fails to see the significance of that factor, however, and it has been held that the trustee in bankruptcy, because he only acquires the debtor's interest in insurance policies, takes such policies subject to their limitation periods. *See Hebert v. Jarvis & Rice & White Ins., Inc.,* 134 Vt. 472, 365 A.2d 271 (1976) (trustee takes insurance policies subject to their limitation periods).

■ Moreover, the mere pendency of the action as it existed between the insurers and the Houskas did not serve to absolve the trustee of any duty to timely intervene to the extent the trustee wished to claim an interest separate and apart from the timely counterclaim filed by the Houskas. *See World of Tires, Inc. v. American Ins. Co.,* 360 Pa.Super. 514, 520 A.2d 1388, 1391 ("Perma Tread had a separate right to bring an action on the insurance contract and this was controlled by the limitations clause in the contract. Appellant's right existed irrespective of World of Tires' actions and there is no basis to tack on the time of filing of World of Tires' complaint to the subsequent filing by appellant."), *appeal denied,* 516 Pa. 623, 532 A.2d 20 (1987); *see also In re Master Mortgage Invest. Fund, Inc.,* 165 B.R. 453 (Bankr.W.D.Mo. 1993) (mortgagee's action as loss payee is separate from insured's and intervention does not relate back to date named insured filed suit).

■ Nor do the cases relied upon by the trustee and Cenit support their argument that a request by a plaintiff for a declaratory

judgment tolls the statute of limitations where, as here, the counterclaims sought to be introduced past such a limitation period seek relief beyond the scope of those issues sought to be adjudicated by the original parties. *See E.W. Bliss Co. v. The Cold Metal Process Co.,* 156 F.Supp. 63, 66 (N.D.Ohio 1957), where the court held that the counterclaim filed related back to the original suit because:

> The filing of the amended answer containing the counterclaim did not inject any new issue in the case. *Simonetti v. Niagara Fire Ins. Co.,* [ ( ] D.C. [Ala.1947) ], 74 F.Supp. 726.

> Under the issues raised by the complaint, the Court was called upon to determine the validity of the patent s in suit and whether Bliss' mills infringed them. The counterclaim raises identical issues.

In short, to the extent the trustee wishes to step into the Houskas' shoes for purposes of making their involvement timely, *see* Trustee's Mem in Opp. to Pl.Mo. for Summ.J. at 7—"the Trustee is attempting to claim no more than that originally claimed by the debtors"—the trustee must subject himself to the claims and defenses originally and timely asserted. The trustee simply cannot have it both ways.

However, in this case, because the court finds that the trustee can only assert the rights derived from the Houskas as to the real property claim, the claim of the trustee is derivative and the insurers are not presented with having to defend an unexpected claim after the suit limitation period. As such, the claim relates back to the counterclaim timely filed by the Houskas. In *Link Aviation, Inc. v. Downs,* 325 F.2d 613 (D.C.Cir.1963), where plaintiff timely filed suit, the court held that an insurer subrogated to the rights of the plaintiff could be substituted as plaintiff under Fed.R.Civ.P. 17(a) despite the expiration of a three-year limitation period. The court there quoted *Kansas Elec. Power Co. v. Janis,* 194 F.2d 942, 944 (10th Cir.1952) in language that fully supports permitting the trustee to continue in this action:

> [J]oining of the insurance companies as additional parties plaintiff did not change

the cause of action in the slightest degree. It did not introduce into the case a new or different cause of action. The cause of action was precisely the same and the same relief was sought against the defendant. The claim both before and after the addition of the insurance companies as parties centered around the pivotal question whether the wrongful acts and conduct of the defendant constituted the proximate cause of the fire which damaged the building owned by the original plaintiffs. The joinder of the insurance companies as the real parties plaintiff was proper in the circumstances.

*Link Aviation,* 325 F.2d at 615 (quoting *Janis, supra*). This court likewise finds it proper to permit the trustee to intervene after the suit limitation period in order to assist the Houskas in their effort to recover insurance payments, which in the case of any USF & G payment as to the real property, is property of the estate.

### CONCLUSION

Insofar as American Bankers has moved for summary judgment against the trustee on the grounds that proceeds from its policy of insurance are not property of the estate, its motion for summary judgment is GRANTED. In relation to the intervention of the trustee as a party, this court holds that as a condition of intervention the trustee is limited in his rights to those of the Houskas insofar as insurance on the realty is concerned. In all other respects, the insurers' and trustee's cross-motions for summary judgment are DENIED. The Houskas as named insureds still have a claim related to their personalty against American Bankers as well as USF & G. As noted, the Houskas have abandoned all claims for damages to the dwelling and the trustee has abandoned all claims for damages to the exempted personalty. The trustee's participation is derivative of the Houskas' and the trustee is accordingly subject to the defenses of arson and misrepresentation.

The trustee has orally moved for an interlocutory appeal of this decision. At this time the Houska's second trial attorney has asked to withdraw, which request this court at this time has refused. Trial of this matter has been continued due to the indictment of the Houskas for bankruptcy fraud and their inability to presently pursue this case for fear of prejudicing the disposition of their criminal case by vigorously pursuing this civil action. The court is informed that as between the trustee and the insurers a valuation has been determined as to the real property in question and no trial as between those parties is needed for that purpose. The court has also been informed that if the trustee's rights are determined finally by an appellate court, there is a strong likelihood that the remaining issues will be resolved. The court is of opinion that this order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of the litigation. Accordingly, the court CERTIFIES this order for interlocutory appeal, and the court will stay proceedings in this court for an initial period of thirty (30) days to permit the trustee to make application to the United States Court of Appeals for the Fourth Circuit.

IT IS SO ORDERED.